**COMMITTEE FOR PROTECTION OF FIRST AMENDMENT RIGHTS OF DEPARTMENT OF AGRICULTURE EMPLOYEES, Plaintiff,**

v.

**Bob BERGLAND, Secretary of Agriculture, et al., Defendants.**

**Civ. A. No. 77–0481.**

United States District Court, District of Columbia, Civil Division.

June 3, 1977.

---

**316**

Carl L. Shipley, Washington, D. C., for plaintiff.

Joseph Guerrieri, Asst. U. S. Atty., U. S. Dist. Court, Washington, D. C., Brook Hedge, Dept. of Justice, Washington, D. C., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

#### Introduction

Plaintiff, an *ad hoc* organization composed of past and present employees of the United States Department of Agriculture occupying positions in the field service entitled "state directors" of the Farmers Home Administration (FmHA) and "executive directors" of the Agricultural Stabilization and Conservation Service (ASCS), brought this action for declaratory and injunctive relief to enjoin the defendants from denying its members employment "on the basis of their political beliefs and associations."[1] The gravamen of the complaint is that defendant Bergland, the Secretary of Agriculture, "is dismissing and threatening to dismiss plaintiff's members from their positions . . . for partisan political reasons and threatening to and has appointed political supporters of the Carter administration to the positions now occupied by

plaintiff's members in consideration of their political support."[2] Additionally, plaintiff alleges that the Department of Agriculture has requested the Civil Service Commission to re-classify the employment positions at issue in order to evade its members' statutory and constitutional rights. Moreover, it is asserted that any action undertaken by the Civil Service Commission (Commission) to this end, as well as, the rules guiding the Commission in this regard, operate to deny plaintiff's members their rights, under the First and Fifth Amendments to the United States Constitution.

On April 22, and April 25, 1977, the Department of Agriculture terminated a total of nine (9) FmHA State Directors and seventeen (17) ASCS State Executive Directors. The following day, at plaintiff's request, a hearing was held on plaintiff's motion for a temporary restraining order which motion was denied. Subsequently, plaintiff filed a motion for a preliminary injunction, which the defendants opposed. Defendants also submitted a motion to dismiss. On May 12, and May 13, 1977, a hearing was held on the motion for a preliminary injunction consolidated with a hearing on the merits. Fed.R.Civ.P. 65(a)(2). Based on the hearing and the record herein, the Court makes the following findings of fact and conclusions of law.

#### Findings of Fact

1. The Agricultural Stabilization and Conservation Service (ASCS) is an agency within the Department of Agriculture. Its principal functions include the administration of the acreage allotment and farm marketing quota program under the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C. § 1301 *et seq.*, and of commodity price support and farmland conservation programs. See 7 C.F.R. § 2165. ASCS supervises and works through county committees elected by farmers in each state, pursuant to 16 U.S.C. § 590h(b). State Committees establish the policies for program operations within the state to achieve the Administration's program objectives.

1. Complaint, ¶ 4.

2. Complaint, ¶ 6, p. 2.

2. State Executive Directors are appointed by the Administrator of ASCS, upon the recommendation of the State Committee. The State Executive Director is responsible for planning, organizing, directing and coordinating the program and management operations of the ASCS State Office, which administers ASCS programs. He also assists the State Committee in determining and establishing ASCS State policies and programs. There are a total of 50 State Executive Director positions.

3. The Farmers Home Administration (FmHA) is also an agency within the Department of Agriculture. It is responsible for loan and grant and other assistance programs for the benefit of rural areas, including assistance authorized under the Consolidated Farm and Rural Development Act, 7 U.S.C. §§ 1921 *et seq.*

4. FmHA has a National Office in Washington, D. C., 42 State Offices, some serving more than one state, and approximately 1750 local County Offices. Each State Office is under the supervision of a State Director who is responsible to the FmHA Administrator, for FmHA programs in one or more states, in accordance with established policies and delegations of authority. See 7 C.F.R. § 1800.22.

5. The testimony of Mr. Victor Senechel, Acting Administrator of ASCS, and Mr. Harold Gross, Assistant to the Secretary of Agriculture for Personnel, indicated that both the FmHA State Directors and the ASCS State Executive Directors, exercise considerable control over the implementation of the administration's agricultural program policies at the state and local level, and, thereby, insure either the success or failure of the programs. This fact was corroborated by statements of three terminated employees, Penrose Hallowell, Frank H. Pope, and Gilbert L. French, who testified as to their budgetary authority and their distribution of millions of dollars in a state program. Each State Director supervised a substantial staff which numbered approximately 100 state-wide. Each di-

rector acted as a public speaker and educator regarding the administration's programs. The director thereby served as the administration's pipeline and advocate at the state and the local level.

6. The positions of FmHA State Directors and ASCS State Executive Directors have been designated by the United States Civil Service Commission as "Schedule A" in the "excepted service",[3] pursuant to 5 U.S.C. § 3302 and 5 C.F.R. §§ 6.2, 213.3101 *et seq.* The three schedules in the "excepted service" are defined as follows:

Schedule A. Positions other than those of a confidential or policy-determining character for which it is not practicable to examine shall be listed in Schedule A.

Schedule B. Positions other than those of a confidential or policy-determining character for which it is not practicable to hold a competitive examination shall be listed in Schedule B. Appointments to these positions shall be subject to such noncompetitive examination as may be prescribed by the Commission.

Schedule C. Positions of a confidential or policy-determining character shall be listed in Schedule C.

7. On March 1, 1977, the Department of Agriculture requested the Commission to convert the ASCS positions from Schedule A to Schedule C. The Commission has not yet acted on the request. As of the date of the hearing, the Department of Agriculture has not requested a conversion for the Farmers Home Administration positions.

8. On April 22, and April 25, 1977, the Department of Agriculture and Mr. Victor A. Senechel, Acting Administrator of ASCS, indicated that at the direction of the Secretary of Agriculture, a review was undertaken of all incumbents in the FmHA and ASCS directors positions. The objective of the review was to determine which individuals were of such outstanding quality that they would be retained. Mr. Senechel conducted the review based on his personal knowledge of the incumbents and his

---

**3.** The term "excepted service" connotes positions "excepted" from the competitive require-
ments of the Civil Service Commission. 5 C.F.R. § 6.1.

lengthy experience with the Department's programs. Mr. Gross participated in overseeing the review of both the agencies' positions and received comments from officials of the previous administration, civil rights and public groups, members of Congress, and state governors.

9. Because the FmHA and ASCS State Directorships are positions excepted from the competitive service, they were viewed historically as patronage jobs. Thus, it was generally understood and expected that the incumbents would be replaced by individuals who supported the policies and programs of the new administration.

10. It was the desire of the Department of Agriculture to simplify the proceedings by avoiding problems of veterans preference. The termination of non-veterans, who would have no right of administrative appeals, occurred first.

11. Although all incumbents, except one, were appointed during the Nixon-Ford administrations, the testimony was uncontroverted that the Carter administration did not know in fact to which political party the incumbents belonged, nor did officials at the Department of Agriculture, at any time, suggest or coerce the incumbents to support the Democratic Party in return for retaining their jobs.

### Conclusions of Law

■ 1. The Civil Service Commission is not properly before this Court because it is not a suable entity *eo nomine*. *Blackmar v. Guerre*, 342 U.S. 512, 515, 72 S.Ct. 410, 96 L.Ed. 534 (1952).

■ 2. Furthermore, the Court lacks subject matter jurisdiction over the controversy with respect to the issues addressed to the Commission. The Commission has not taken any action to remove any positions from Schedule A. Therefore, plaintiff has failed to present issues which can be "pressed before the Court with the clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multi-

faced situation embracing conflicting and demanding interests . . . " *Flast v. Cohen*, 392 U.S. 83, 95–97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). In such circumstances, the Court is not presented with a case or controversy sufficient to satisfy the jurisdictional requirements of Article III of the Constitution. See *International Longshoremen's and Warehousemen's Union v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954).

■ 3. Plaintiff has failed to demonstrate that the terminated employees have a statutory or constitutional right to a statement of reasons and a hearing upon dismissal.

4. In order to establish a right to such procedural due process, plaintiff must show that such a right is conferred by statute, by regulation, by the terms of employment, or that such a right is afforded under the Fifth Amendment to the Constitution because of a property interest in the job.

■ 5. An employee in the excepted service, however, is simply not entitled to the benefits accorded those in the competitive service under the Lloyd-LaFollette Act, 5 U.S.C. § 7501. *Chollar v. United States*, 126 F.Supp. 448, 130 Ct.Cl. 338 (1954). Specifically, an employee in the excepted service, who is not a veteran, has no statutory or regulatory right to a statement of reasons, or adverse action appeal rights. 5 C.F.R. § 752.103(a)(6); see also *Vitarelli v. Seaton*, 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

■ 6. In light of the nature and terms of the employment (*e. g.*, the excepted service) and in view of the fact that the non-veterans are excepted from statutory provisions granting due process protections, there is no property right to continued employment under which constitutional protections could be invoked. *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); *Board of Regents v. Roth*, 408 U.S. 564, 576–578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Keim v. United States*, 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774 (1900). Indeed, our own Court of Appeals has made it clear that:

[D]etermining the employment relationship . . . specifically negates a reasonable prospect of continued employment which might otherwise give rise to a legitimate claim of entitlement requiring procedural due process protection.

*Mazeleski v. Truesdell*, No. 75–1817 op. 13–14 (D.C.Cir. April 26, 1977).

7. The discharge of plaintiff's members does not constitute a violation of their First Amendment rights to freely associate. Plaintiff's reliance on the Supreme Court's recent decision in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) is misplaced. The plaintiffs in *Elrod* whose discharge was found to violate the First Amendment, were employees of the Cook County, Illinois, Sheriff's Office, not Federal employees. They occupied ministerial positions such as process server, bailiff, security guard, and clerk. The duties and responsibilities of the positions affected here are obviously of an entirely different nature from those occupied by the plaintiffs in *Elrod.*

8. Even assuming *arguendo* that *Elrod* is applicable to the Federal Government's Schedule A employees, the facts of the instant case fall within the exception in *Elrod*, not the general rule. In *Elrod*, five justices agreed that plaintiffs because they occupied only nonpolicy-making, nonconfidential positions, could not be discharged upon the sole ground of their political beliefs. However, the plurality opinion indicated that, if the plaintiffs had occupied policy-making positions, a dismissal for political reasons would have been justified. 427 U.S. at 367–368, 96 S.Ct. 2673. The Court discussed the policy-making/nonpolicy-making distinction as follows:

> No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibilit[ies], that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. *An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals.* . . . 427 U.S. at 367–368, 96 S.Ct. at 2687 (emphasis added)

9. The responsibilities of FmHA State Directors (all of whom are grade GS–15 employees) and ASCS State Executive Directors (who are either grade GS–13, GS–14, or GS–15 employees) as set forth in their position descriptions are "policymaking" responsibilities, as that term is defined in *Elrod.* The ASCS State Executive Director, grade GS–15, for example is described as:

> [F]ully responsible for planning, organizing, and directing the program and management operations of ASCS activities throughout the State. Within broad policy, makes decisions and commitments on all phases of administration of the assigned programs, and actively participates . . . in State ASCS program and policy formulation. Recommends changes and revisions in State and National policies . . .

Similarly, the FmHA State Director:

> [F]ormulates and implements the total FHA program within the State jurisdictional area, exercising executive leadership in developing and implementing operating principles and practices desirable or necessary to promote and achieve the purposes and objectives of the overall FHA program or specialized phases thereof. Gives emphasis to development of annual goals and long-range plans of operations . . . . .

These responsibilities are of broad scope, and include participation in the formulation of program policies and procedures. The difference between these positions and those of the plaintiffs in *Elrod* is substantial.

**320**

10. That these positions have been designated as Schedule A by the Civil Service Commission, rather than Schedule C "confidential or policy-determining positions," 5 C.F.R. § 213.3301, does not mean that they are "not policy-making" positions within the ambit of *Elrod*.

 11. In *Elrod*, plaintiffs were discharged because they were not members of a political party and had failed to obtain the sponsorship of one of the party's leadership. It appears from the facts of *Elrod* that plaintiffs in that case could have retained their employment by the simple expedient of affiliating with the Sheriff's party. From these facts, the plurality concluded that the Sheriff was interfering with the free association of rights of his employees and the concurring judges concluded that the employees were discharged solely because of their "political beliefs." However, there are no facts in the record to show that the Secretary of Agriculture would have permitted any of these employees to remain if they affiliated with the Democratic Party, no facts to show that the Secretary attempted in any way to require these persons to associate with his own party, or interfered in any way with their exercise of First Amendment rights, as was the case in *Elrod*. Plaintiff has simply failed to establish an infringement of a constitutional guarantee.

12. Plaintiff in seeking a preliminary injunction has failed to satisfy the familiar prerequisites for extraordinary relief enunciated in *Virginia Petroleum Jobbers v. F. P. C.*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). *See also Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

### ORDER

In accordance with the accompanying Findings of Fact and Conclusions of Law, it is by the Court this 3rd day of June, 1977,

ORDERED, that plaintiff's motion for preliminary injunction should be and the same hereby is denied, and it is

FURTHER ORDERED, that defendants' motion to dismiss should be and the same hereby is granted, and it is

FURTHER ORDERED, that the above-captioned action should be and the same hereby is dismissed.