# Removal of Members of the Commission on Federal Laws for the Northern Mariana Islands

The basic presumption underlying the general law on the President's removal authority is that the power to appoint implies the power to remove. Although Congress may alter this presumption by an express indication to limit the President's removal authority, consistent with constitutional requirements, it has not done so in establishing the Commission on Federal Laws for the Northern Mariana Islands.

Members of the Commission are appointed by the President. The covenant establishing the Commission and its legislative history indicate no intention to restrict Presidential removal power. Accordingly, in the absence of any congressional intent to the contrary, the President has the authority to remove Commission members in his discretion, even though the Commission performs no executive functions and provides services exclusively to the Legislative Branch.

April 14, 1983

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum responds to your request for our opinion whether the President may remove members of the Commission on Federal Laws for the Northern Mariana Islands (Commission). You have transmitted to us two memoranda prepared by different officials of the Department of Interior reaching conflicting conclusions on this question, and have asked us to resolve the matter. The first memorandum, which was prepared by the Assistant Solicitor to the Associate Solicitor, Division of General Law, Department of the Interior, concludes that the Commission is an adjunct of Congress and, as such, part of the Legislative Branch. This conclusion rests on a determination that the sole function of the Commission is to make recommendations to Congress about the applicability of laws of the United States to the Northern Mariana Islands, which recommendations Congress may or may not enact in legislation. This memorandum reasons that because the Commission is part of the Legislative Branch, Congress must have intended that the President would not have the authority to remove Commission members in his discretion. The second memorandum, which was prepared by the Associate Solicitor of the Interior Department, concludes that because the President has the authority to appoint Commission members, the presumption must be that Congress intended that the President also has the power to remove members at will. This presumption is not found to be overcome by any express indication of congressional intent to limit Presidential removal authority. Without specifically discussing the ratio-

nale of the first memorandum, the second memorandum tacitly accepts the possibility that the President may have plenary removal authority over advisers to the Legislative Branch, at least absent any clear indication to the contrary by Congress.

In our view, the second of these memoranda more faithfully reflects in its reasoning and conclusion the key principles concerning Presidential removal power. We believe that the President may, in his discretion, remove Commission members, even assuming *arguendo* that the Commission is an entity which performs no Executive functions whatsoever and provides services exclusively to the Legislative Branch. An important, but not necessarily dispositive principle in interpreting statutes regarding matters of removal from office, is that the power to appoint implies the power to remove absent some affirmative indication of congressional intent to the contrary. We have found no such indication in this instance. Indeed, Congress vested the appointment power over members of this entity in the President without in any way suggesting that the appointing authority did not retain the power of removal.

In Part I, we will discuss the background of this issue; in Part II, we will analyze the pertinent legal issues.

## I. Background

The Commission was established pursuant to a joint resolution adopted in 1976, which approved the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America" (Covenant). Pub. L. No. 94–241, 90 Stat. 263 (1976). The joint resolution approving the Covenant in general marked a new stage in the ongoing relationship between the United States and the Northern Mariana Islands (Northern Marianas). The Northern Marianas are part of the Pacific Trust Territories.[1] The trusteeship arrangement with the Northern Marianas established after World War II eventually will terminate, and the islands will become a Commonwealth in Political Union with the United States.

The function and composition of the Commission are set forth in § 504 of the Covenant, as follows:

> *The President will appoint a Commission on Federal Laws to survey the laws of the United States and to make recommendations to the United States Congress as to which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner, and which applicable laws should be made inapplicable and to what extent and in what manner.* The Commission will consist of seven persons (at least four of whom will be

---

[1] In addition to the Northern Mariana Islands, the Pacific Trust Territories include Palau, Truk, the Marshall Islands, Ponape and Yap. *See* S. Rep. No. 596, 94th Cong., 2d Sess. 13 (1976). The major islands of the Northern Marianas are Saipan, Tinian and Rota.

citizens of the Trust Territory of the Pacific Islands who are and have been for at least five years domiciled continuously in the Northern Mariana Islands at the time of their appointments) who will be representative of the federal, local, private and public interests in the applicability of laws of the United States to the Northern Mariana Islands. *The Commission will make its final report and recommendations to the Congress within one year after the termination of the Trusteeship Agreement,* and before that time will make such interim reports and recommendations to the Congress as it considers appropriate to facilitate the transition of the Northern Mariana Islands to its new political status. In formulating its recommendations the Commission will take into consideration the potential effect of each law on local conditions within the Northern Mariana Islands, the policies embodied in the laws and the provisions and purposes of the covenant. The United States will bear the cost of the work of the Commission.

Pub. L. No. 94–241, § 504, 90 Stat. 268 (1976) (emphasis added).[2] Thus, the President appoints the Commission members, and the Commission makes recommendations to Congress about the applicability of United States laws to the Marianas. The Commission's final report will be made not later than one year after the termination of the trusteeship arrangement with the Marianas. The Commission members are not appointed to determinate, fixed terms of service.[3]

## II. Discussion

Before analyzing this particular case, we first consider the broader legal principles that have been held by the courts to be applicable to questions regarding the power of the President to remove his appointees. As we will discuss below, the fundamental principle applicable in removal cases is that the power to appoint implies the power to remove. Congress has, however, frequently sought to limit the President's power to remove and replace those whom he (or his predecessor) has appointed to particular positions. Accordingly, it is necessary to turn preliminarily to the intent of Congress and

---

[2] The Commission is the latest in a line of similar Commissions whose purpose has been to advise Congress on the applicability of United States laws in different areas. *See* 30 Stat. 750, 751 (1899) (Hawaii); 45 Stat. 1253 (1929) (American Samoa); 64 Stat. 390 (1950) (Guam); 68 Stat. 501 (1954) (Virgin Islands). The status of the members of the 1899 Hawaiian Commission are the subject of a House Judiciary Committee report. *See* H.R. Rep. No. 2205, 55th Cong., 3d Sess. (1899). The question addressed in that report — whether members of the Hawaiian and similar commissions were "officers" of the United States, and thus whether the constitutional bar on service as civil officers by Members of Congress (some of whom served on such advisory commissions) applied — is not germane to this opinion. In our view, the issue of the President's removal power may be settled without deciding whether the Commission members are "officers" of the United States.

[3] It is of course possible that the trusteeship agreement will not actually terminate for some years.

determine whether Congress has sought to restrict the appointing authority's removal power. If there is persuasive evidence of such a congressional intent, it is necessary to determine whether there is any constitutional limit on Congress' effort to restrict removal power in a given case.

Thus, our analysis will commence with the basic principles regarding removal, and then will focus on the question whether Congress endeavored to limit the President's removal power in this instance. Because, as we conclude, there is no sufficient basis on which to infer such an intent, we do not reach the further question whether it would be constitutional for Congress to limit the President's removal power in this context.[4]

A basic presumption, albeit rebuttable, underlying the general law on the President's removal authority is that the power to appoint implies the power to remove. This principle has been recognized by Congress and the Supreme Court since the earliest days of the Republic, and has been ratified repeatedly in modern case law. See 1 Annals of Cong. 469 (1789) (statement of James Madison on the floor of the House of Representatives during the Great Debates of 1789); Matter of Hennen, 38 U.S. (13 Pet.) 230, 259–60 (1839); Blake v. United States, 103 U.S. 227, 231 (1880); Keim v. United States, 177 U.S. 290, 293–94 (1900); Shurtleff v. United States, 189 U.S. 311, 314–15 (1903); Myers v. United States, 272 U.S. 52, 119 (1926); Cafeteria Workers v. McElroy, 367 U.S. 886, 896–97 (1961); Sampson v. Murray, 415 U.S. 61, 70 n.17 (1974); National Treasury Employees Union v. Reagan, 663 F.2d 239, 246–48 (D.C. Cir. 1981); Kalaris v. Donovan, 697 F.2d 376, 389 (D.C. Cir. 1983); Martin v. Reagan, 525 F. Supp. 110, 112 (D. Mass. 1981).

This principle applies to the appointments by the President and by other Executive officers, such as department heads, who are appointing officials. A fundamental rationale for this principle appears to be the notion that appointing authorities necessarily have some degree of supervisory responsibility with respect to those whom they appoint. In particular, the appointing authority retains a certain duty to assure that the appointed official carries out his duties in a satisfactory manner. This idea is reflected in the Supreme Court's statement in Shurtleff v. United States, 189 U.S. at 316, that the principle recognizes an "inherent" implication of the appointing power:

> The right of removal would exist if the statute had not contained a word upon the subject.[5] It does not exist by virtue of the grant, but it inheres in the right to appoint, unless limited by Constitution or statute.

(Emphasis added.) In another passage in Shurtleff, 189 U.S. at 314–15, the Court explicitly drew the connection between this principle and the notion that

---

[4] Because the Commission merely advises Congress and does not exercise purely Executive powers, we acknowledge that the courts are most likely to uphold restrictions on Presidential removal power with respect to this type of entity, if such restrictions are intended by Congress. Cf. Wiener v. United States, 357 U.S. 349 (1958); Humphrey's Executor v. United States, 295 U.S. 602 (1935).

[5] This is the case here. The statute creating this Commission contains not a word on the subject of removal.

an appointing official necessarily has a degree of supervisory responsibility with respect to those whom he appoints. The Court wrote with respect to the President's power to remove an official appointed with advice and consent:

> It cannot now be doubted that in the absence of constitutional or statutory provision the President can by virtue of his general power of appointment remove an officer, even though appointed by and with the advice and consent of the Senate. . . . Congress has regarded the office as of sufficient importance to make it proper to fill it by an appointment to be made by the President and confirmed by the Senate. It has thereby classed it as appropriately coming under the direct supervision of the President and to be administered by officers appointed by him, (and confirmed by the Senate,) with reference to his constitutional responsibility to see that the laws are faithfully executed. Article II, sec. 3.

*Id.* This emphasis on the appointing authority's supervisory responsibility for officials whom he appoints also appears in *Myers* v. *United States,* 272 U.S. at 119, where the Court wrote:

> The reason for the. principle is that those in charge of and responsible for administering functions of government who select their executive subordinates need in meeting their responsibility to have the power to remove those whom they appoint.

In addition, the basic principle that the power to appoint implies the power to remove reflects a practical awareness of the need for a rule for use in cases in which the governing statute is silent on removal. Absent such a rule, it would be unclear who has the power of removal. By providing that, as a general matter, the appointed official serves at the discretion of the appointing authority, the principle also helps prevent the possibility of an official serving indefinitely in his position, a status disfavored under normal understandings of tenure of office in the United States. As the Court wrote in *Matter of Hennen,* 38 U.S. at 259:

> All offices, the tenure of which is not fixed by the Constitution or limited by law, must be held either during good behavior, or (which is the same thing in contemplation of law) during the life of the incumbent; or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.
>
> It cannot, for a moment, be admitted, that it was the intention of the Constitution, that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision, or statutory regulation, it would

seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment.

This general principle accordingly provides the starting point for discussion: absent contrary indication in the governing legislation, the President's power to appoint members of the Commission implies the President's power to remove such members. This approach has the additional virtue of being consistent with the position that the Executive Branch has taken in case after case and legal opinion after legal opinion throughout this nation's history. Of course, it allows Congress to alter the starting point by expressing a contrary intent consistent with constitutional requirements. Our task is to determine whether any relevant indications of legislative purpose preclude or overcome the application of the general principle in this case. We find no reliable evidence of such an intent, and we therefore conclude that the President's authority to remove Presidential appointees from the Commission was not restricted by the Legislature.

First of all, the Covenant establishing the Commission and the legislative history of the Covenant contain no language indicating a specific intention to restrict Presidential removal power. The joint resolution itself is silent on the question. The legislative history, when it discusses the Commission at all, tends simply to repeat the basic provisions of § 504 of the Covenant, quoted above.[6] For example, the legislative history underscores that Congress intended the President to appoint Commission members, and it reveals no effort to require either any congressional participation in the appointing process or any limitation on the exercise of removal authority.

Furthermore, the typical indicia of congressional intention to restrict Presidential removal power that have been relied upon by the courts in the leading decisions on this subject in finding such an intention are generally not present here. For example, there is no express or implicit provision limiting removal of Commission members for stated "causes." *Cf. Humphrey's Executor* v. *United States*, 295 U.S. 602, 619 (1935). Also, there is no provision in the Covenant providing that the Commission's decisions are to be transmitted directly to Congress without any review or comment by concerned Executive officials. *Cf. Wiener* v. *United States*, 357 U.S. 349, 352–53 (1958). Nor is there language in the legislative history of which we are aware calling generally for the Commission's "independence" from Executive oversight. *Cf. Humphrey's Executor*, 295 U.S. at 624–25. Finally, the Covenant does not provide for specific, fixed-year terms of service for Commission members. *Cf. id.* at 622–23.

This last point is worthy of particular note. Although the mere presence of a statutory provision for a specific term of service has not been deemed a sufficient basis on which to infer a legislative purpose of restricting Presidential removal authority,[7] the absence of any fixed-year term of service buttresses

---

[6] *See* S. Rep. No. 596, 94th Cong., 2d Sess. 5 (1976); H.R. Rep. No. 364, 94th Cong , 1st Sess. 9 (1975); 122 Cong. Rec. 4187–232 (1976); 121 Cong. Rec. 23662–73 (1975).

[7] Rather, it has been interpreted as providing a limit on the period for which an appointee can serve without reappointment. *See Parsons* v. *United States,* 167 U.S. 324, 338 (1897).

the argument that the President has removal authority in this case. Commission members are to serve not longer than one year after the termination of the trusteeship agreement with the Northern Mariana Islands.[8] Although this provision establishes some outer limit of service, it does not establish any definite, fixed term of service. To the contrary, given that the trusteeship agreement conceivably could last for a substantial length of time, the linkage between its continuance and the Commission's existence establishes that Commission members would, if not removable by someone, serve for an indefinite period. Because, as a general matter, good behavior is presumed, an official who can be removed during an indefinite term of service only by way of impeachment, or for "cause" as a result of "bad behavior," is considered to have the possibility of life tenure. *Cf. Shurtleff* v. *United States*, 189 U.S. at 316; *Matter of Hennen*, 38 U.S. at 260; *Kalaris* v. *Donovan*, 697 F.2d 376, 398 (D.C. Cir. 1983); *see also DeCastro* v. *Board of Comm'rs of San Juan*, 322 U.S. 451, 462 (1944); *Reagan* v. *United States,* 182 U.S. 419, 426–27 (1901). Accordingly, the presumption against the possibility of life tenure supports the view that the President has removal authority in this case.

Another factor which must be noted is that Congress has provided for the Commission's funding through a line item in the Department of the Interior's appropriation for territorial affairs. *See* Pub. L. No. 96–126, 93 Stat. 954, 969 (1979). The source of funding by itself is not necessarily a determinative indication of an entity's status as in the Executive or Legislative Branch. *See Eltra Corp.* v. *Ringer*, 579 F.2d 294, 301 (4th Cir. 1978). Nevertheless, the fact that Congress has provided for the Commission to receive its funds from the Interior Department's appropriation is a further indication, albeit relatively slight, that Congress did not intend to establish the kind of independence from the Executive Branch that normally accompanies restrictions on Presidential removal authority.

It might be argued that *Humphrey's Executor*, 295 U.S. at 624–25, provides support for a contrary argument. In *Humphrey's Executor,* the Court held that the President did not have unlimited removal authority with respect to members of the Federal Trade Commission. Although much of the Court's opinion dealt with the constitutional questions raised by the case, the Court did discuss the statute involved. One of the factors relied upon in its statutory construction was the fact that the FTC performed "quasi- legislative" functions, namely, rulemaking, which the Court concluded were intended by Congress to be performed by an entity independent of the President's plenary removal authority. In the present case, it might be suggested that the Northern Mariana Islands Commission's sole function is to advise Congress in aid of its legislative power, and thus it should be viewed as an arm of Congress. From this premise, it might be argued that one should infer that Congress did not intend to allow

---

[8] Section 504 of the Covenant establishing the Commission provides that the Commission will make its final report within one year of the termination of the trusteeship agreement. Hence, the Commission is to go out of existence after that time.

101

the President to remove Commission members, *i.e.,* members of a Congressional entity, in his unfettered discretion.

Although the foregoing argument is by no means frivolous, we do not believe that *Humphrey's Executor* provides support for the interpretation that the President lacks removal power over members of this Commission. The Court in *Humphrey's Executor* noted that several indicia of congressional intent, taken together, existed to support the conclusion that Congress intended to limit the President's removal authority. *See* 295 U.S. at 624–26. Not the least of these factors was an explicit statutory provision limiting the grounds for removal. In addition, the FTC Commissioners served for a specified term of years, and according to the Court, the legislative history made clear that Congress expected them to act independently of Executive Branch influence. Furthermore, unlike the FTC, the Commission here does not exercise quasi-legislative powers. It performs merely an advisory function. A body such as this might provide advice to any branch of government. Its function, therefore, does not by itself suggest the need for its separateness from the Executive Branch. *See id.*; *see also Martin* v. *Reagan,* 525 F. Supp. 110, 112–13 (D. Mass. 1981). Thus, the situation in *Humphrey's Executor* is fundamentally distinguishable from the situation in this case.[9]

Even if we grant that the Commission is an arm of Congress, and thus entirely part of the Legislative Branch (a conclusion which we do not reach and do not intend by anything articulated herein to prejudge), it does not follow that the President cannot remove the Commissioners in his discretion.[10] If the Commission is entirely part of the Legislative Branch, Congress did not have to vest appointment power in the President. But it did so nonetheless. This grant of the appointment power has two key implications.

First, because the appointment power by itself is by no means an insignificant power with respect to appointed officials, Congress clearly acceded at least to a significant degree of Presidential supervision of Commission members. *See Shurtleff* v. *United States,* 189 U.S. 311, 315 (1903).[11] Second,

---

[9] We also believe that this case is clearly distinguishable from *Wiener* v. *United States,* 357 U.S. 349 (1958). That case involved an adjudicatory body, the War Claims Commission, whose statute provided that its decisions were to be free from review by any other official of the United States. *See id.* at 354–55 In contrast, no adjudicatory functions such as those in *Wiener* are performed by the Commission and no concomitant need exists for "independence" from the Executive. In addition, there is no similar statutory provision in this case indicating an intent to shield the Commission's decisions from review by other officials. *Cf. Borders* v. *Reagan,* 518 F. Supp. 250 (D D.C. 1981); *Lewis* v. *Carter,* 436 F. Supp. 958 (D.D.C. 1977).

We add that the argument based on the functions of the Commission is more central with respect to the constitutional question whether Congress can limit Presidential removal power. *Cf Humphrey's Executor,* 295 U.S. at 631–32. As noted at the outset, we do not need to reach this issue, given that we are able to resolve the question on the basis of an analysis of the statute and the principle that the power to appoint implies the power to remove.

[10] We note that, in a different context, the Comptroller General has concluded that the Commission is a Legislative Branch entity. *See* Comp. Gen. Op. No. B-202206 (June 16, 1981).

[11] As the Court noted in *Keim* v. *United States,* 177 U.S. 290, 293 (1900): "The appointment to an official position in the Government, even if it be simply a clerical position, is not a mere ministerial act, but one involving the exercise of judgment. The appointing power must determine the fitness of the applicant; whether or not he is the proper one to discharge the duties of the position."

because the law is that the power to appoint implies as a basic underlying proposition the power to remove, and because we must assume that Congress was aware of the law, Congress may reasonably be said to have taken for granted in this case that the President would have the power to remove Commission members appointed by him or a previous President. If Congress had rejected these implications, it easily could have provided for some other method of appointment or specifically limited the President's power to remove the Commissioners.

## Conclusion

To summarize, we believe that the Congress is undoubtedly aware that the power to appoint has been held throughout this nation's history to imply the power to remove, and that Congress has within its control the ability to overcome this presumption, at least as a statutory matter. In construing the relevant statutory materials in this case, we have found no intent to restrict the President's removal power and some slight indication that potential removal by the President actually was intended (no term specified, the failure to designate someone else to exercise removal authority, and other factors discussed herein). We conclude that the President has the authority to remove Commission members in his discretion.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*